# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of Parenting and Support of | No.  49626-7-II |
| CJM, | |
| Child. | |
| SHAKIRA McLEROY, | |
| Appellant, | |
| and | |
| JULIAN HARRIS, | UNPUBLISHED OPINION |
| Respondent. | |

JOHANSON, J. — Shakira McLeroy appeals the superior court's modification order that granted primary residential placement of CJM to Julian Harris and the amended parenting plan. McLeroy argues that the trial court erred when it (1) admitted and considered hearsay from Child Protective Services (CPS) reports, (2) based its modification decision on past rather than present circumstances, (3) concluded that CJM's current living situation was harmful to his health and that CJM would benefit from changing primary residential placement, (4) failed to make a finding that Harris has a history of acts of domestic violence, (5) concluded that McLeroy engaged in abusive use of conflict, and (6) ordered McLeroy to pay child support.  We affirm.

FACTS

I.  BACKGROUND FACTS

In 2010, CJM was born to McLeroy and Harris.  In 2012, the trial court entered a permanent parenting plan granting McLeroy primary residential placement.

In April 2015, Harris suspected CJM was being abused, and on behalf of CJM, Harris obtained a domestic violence protection order (DVPO) against McLeroy.  McLeroy filed a motion for contempt against Harris for violating the parenting plan, alleging he failed to return CJM to her.  But the trial court denied her contempt motion because the protection order allowed CJM to remain with Harris.

In August, Harris filed a modification petition, and the trial court ordered temporary custody of CJM to Harris pending the modification trial.  Harris asserted that McLeroy's home environment was detrimental to CJM's mental, physical, or emotional health because there was domestic violence in the home.  In November, the trial court entered an order finding adequate cause to support the modification petition.  Trial occurred on September 27 and 30, 2016.

II.  TRIAL

A.  OPENING STATEMENTS

Harris was pro se at trial.  Harris said that he would call witnesses who would testify about how McLeroy's behavior impacted CJM.

McLeroy's counsel stated that the previous year, McLeroy had been married to an abusive woman named Kanitra Lockett.  Lockett was abusive to McLeroy and "those around her."  Report of Proceedings (RP) (Sept. 27, 2016) at 13.  McLeroy filed for divorce from Lockett and has had no contact with her.  Counsel argued that all abuse allegations "originated from Kanitra Lockett

2

and that relationship" and that because Lockett was no longer involved in McLeroy's life, any issue that had existed was remedied. RP (Sept. 27, 2016) at 13. McLeroy's counsel also asserted that Harris had a domestic violence conviction from 2013 for choking his girlfriend, which could result in RCW 26.09.191 restrictions on his residential time.

## B. MCLEROY'S TESTIMONY

McLeroy met Lockett at the "end of 2013" and had a three-year relationship with her. RP (Sept. 27, 2016) at 22. Lockett was "very abusive" and "controlling" and stalked McLeroy at one point. RP (Sept. 27, 2016) at 22. McLeroy sought counseling to address issues related to the relationship. She also utilized the services of a domestic violence advocate in 2014 and again at the end of 2015. In 2015, with the support of the domestic violence advocate, McLeroy filed for a protection order against Lockett, but she dropped the action when Lockett left McLeroy alone. Lockett stalked McLeroy in April 2016, and McLeroy tried to obtain a housing unit unknown to Lockett.

McLeroy filed for divorce from Lockett, and the divorce was final days before the parenting plan modification trial. McLeroy learned lessons from her relationship with Lockett, including that she would never put herself in that situation again.

There has never been a finding by CPS that McLeroy abused CJM.

During cross-examination, McLeroy stated that she had once obtained a no-contact order against Lockett, but that it was lifted upon McLeroy's consent. Subsequently, when Lockett was stalking McLeroy in 2016, McLeroy chose not to pursue a no-contact order against Lockett and instead trusted Lockett's promises not to engage in further contact.

Harris asked McLeroy whether she has stopped making poor choices such as the choice to be in a relationship with Lockett. McLeroy responded that "I feel as though it wasn't about me making poor choices. It was about me settling for the wrong people in my life, and she's no longer in my life." RP (Sept. 27, 2016) at 39. McLeroy stated that she was the "victim in the domestic violence for three years," but did not acknowledge her poor decision making or the impact this had on CJM. RP (Sept. 27, 2016) at 40.

### C. HARRIS'S TESTIMONY AND MCLEROY'S HEARSAY OBJECTION

Harris testified that sometime after the permanent parenting plan was entered in 2012, he started receiving calls from CPS. After receiving these calls, he met with CJM's daycare provider regarding the CPS calls. Harris noticed CJM had bruises and other signs of physical harm, but McLeroy refused to speak to him about it. CJM sometimes screamed and woke up in the middle of the night, and CJM was "terrified of having to go back" to McLeroy or the grandparents' house. 2 RP at 80. Before living with Harris full-time, CJM was often anxious and acted out in school. CJM once took off his belt and threatened to hit another child with it at school.

Harris obtained a DVPO in Thurston County.[1] After living with Harris and Harris's girlfriend of over four years, Martha Haslem, full-time for over a year, CJM is now more secure and comfortable and is not acting out with violent behavior. CJM expressed fear that he would have to go back to live with McLeroy and asked for reassurance that he would be able to stay with Harris.

---

[1] Testimony refers to the DVPO as a "no-contact order," but the accurate term in this case is DVPO.

4

After a 2013 domestic violence conviction for choking a girlfriend, Harris had been through extensive counseling and parenting classes and learned to provide a stable home. Harris provided CJM with a "structured environment and a loving environment." 2 RP at 84.

Harris sought to introduce CPS records into evidence. McLeroy's counsel said it objected to the "multiple hearsay" in the documents, but that "[t]he CPS records in and of themselves are unremarkable." RP (Sept. 27, 2016) at 41. The trial court admitted the records and said it would disregard the hearsay within them. Harris had received calls regarding welfare checks for CJM as recently as the summer.

On cross-examination, Harris testified that he was convicted of a domestic violence assault against an ex-girlfriend. The victim filed a one-year DVPO against him, which had expired. The ex-girlfriend, who was the mother of one of Harris's children, did not allow Harris to see the child.

McLeroy's counsel questioned Harris about the contents of the CPS records, which had not yet been discussed in testimony. McLeroy's counsel asked Harris how many times CPS received referrals about CJM, and Harris said, "Quite a few." 2 RP at 68. In responding to questions about whether the CPS records contained any finding that McLeroy abused CJM, Harris testified that the reports were ultimately "screened out" or "'unfounded.'" 2 RP at 72.

According to Harris, there was almost no communication between McLeroy and Harris, and CJM's maternal great-grandfather, Louis Robertson, communicated McLeroy's and Harris's messages to each other. When Harris tried to contact McLeroy to discuss CJM, she told Harris that she did not want to talk to him. Harris said, "[I]t makes parenting hard when you don't have two parents that can talk about anything. I'm willing. I try. But it's not from the other side. It's not." RP (Sept. 27, 2016) at 53.

### D. HARRIS'S WITNESSES

Christopher Pontius, CJM's football coach, testified that CJM was a happy and healthy child, Harris always attended CJM's football practices, and Harris was very supportive of CJM.

Haslem also testified. At the hearing to obtain a DVPO against McLeroy, McLeroy threatened to beat up Haslem. Haslem notified the bailiff about the threats.

When CJM lived with McLeroy, Haslem observed bruises and scratches on him. He had a difficult time going to bed on his weekends at Harris's home and frequently woke up screaming in the middle of the night. Harris and Haslem had to console him throughout the night. Since living with McLeroy and Haslem full-time, that issue has not occurred in over a year, and CJM has not acted out in school.

### E. MCLEROY'S WITNESSES

Louis and Bertha Robertson, CJM's great-grandparents and McLeroy's grandparents, testified. Bertha[2] testified that she and Louis transported CJM to meet Harris for weekend residential time. Harris was late more than five or six times to these exchanges and was late three or more times transporting CJM after holidays. Sometimes, when CJM returned from Harris's residential time, CJM smelled like marijuana. The Robertsons, rather than McLeroy, provided transportation when CJM visited with McLeroy. Bertha also stated that McLeroy had not contacted Lockett in over a year.

Louis also testified that Harris was late several times for weekend exchanges. The Robertsons' home was a "safe house for the kids" if McLeroy ever needed assistance. 2 RP at

---

[2] We use first names for Louis and Bertha Robertson for clarity because they share the same last name.

130. Louis spoke often with Harris. Louis acted as a "go-between" to communicate information between McLeroy and Harris because they did not speak to each other. 2 RP at 138.

## F. RELEVANT EXHIBITS

Exhibit 1 is a CPS record that includes McLeroy's statements to police that Lockett punched McLeroy repeatedly in the head, knocked her to the floor, and fled. According to McLeroy's statements, the assault occurred in McLeroy's children's presence. McLeroy also stated that this was not the first time Lockett had assaulted her. Law enforcement referred the matter to CPS. Exhibit 1 also contains a CPS report from CJM's school stating that CJM and his mother both had black eyes and CJM said his mother "whoops" him. Ex. 1 at 14.

Exhibits 2 and 3 provide certification that Harris received 20 hours of parenting class for parents of children who have witnessed domestic violence and also completed 45 group sessions with a domestic violence treatment provider.

Exhibit 4 contains a CPS report regarding an incident at CJM's daycare when he took his belt off and threatened to hit another child.

Exhibit 5 contains documentation that McLeroy utilized a domestic violence advocate's services in August 2015 to obtain a protection order against Lockett. Exhibit 6 contains a letter from April 2016 asking the Tacoma Housing Authority to provide McLeroy with an alternate housing unit because safe housing unknown to Lockett is "an integral part of [McLeroy's] safety plan."

## III. CLOSING ARGUMENTS

Harris argued in closing that McLeroy's testimony demonstrated that CJM was under extreme distress for the three years that McLeroy exposed him to domestic violence. Louis's

7

testimony showed that McLeroy was unwilling to work with Harris, but Harris was willing to work with McLeroy and her family. Harris acknowledged that he had committed domestic violence in the past, but stated that he is now a committed, loving father. He was concerned that McLeroy had not made necessary changes to eliminate domestic violence from her life, and he feared CJM would be exposed to domestic violence if the parenting plan remained the same.

McLeroy's counsel argued in closing that the CPS records provide no finding of abuse of CJM. And counsel argued that because McLeroy has had no contact with Lockett in over a year, domestic violence is no longer an issue, and the court "cannot find that there was a detrimental environment that exists at this time." 2 RP at 147.

## IV. RELEVANT ORAL RULING STATEMENTS

In relevant part, during its oral ruling, the trial court discussed exhibit 1, the CPS report, saying that the report "indicates that there's domestic violence in Mother's home, that she got punched in the head while her three kids were present. . . . In that report, it indicates it's not the first time that [Lockett] had assaulted [McLeroy.]" RP (Oct. 6, 2016) at 4.

The trial court noted that there was a CPS report from CJM's daycare saying CJM and his mother had black eyes and that "Mom whoops him." RP (Oct. 6, 2016) at 4.

## V. PARENTING PLAN MODIFICATION

The trial court entered a final order and findings on Harris's modification petition.

In a portion of the order describing how "the situation has changed" (Clerk's Papers (CP) at 77), the trial court provided the following findings:

> [1] Mother has a history of domestic violence. CPS has been involved multiple times and Mother refused voluntary services in January 2015. Father obtained emergency placement through a Domestic Violence Protection Order on April 1, 2015, at the urging of CPS and filed this Petition to Modify on 8/13/15.

[2] This court found Mr. Harris and Ms. Haslem credible regarding mother's expressed anger at the 5/7/15 Court hearing and the responses of [CJM] upon leaving and returning from supervised visits as well as his insecurity when he first came to their home, including nightmares and demonstrating fears.

[3] Mother lacks insight into domestic violence occurring in the presence of children and while she is the alleged victim of some of the interactions with [Lockett], she is also the aggressor in other dvpo's [sic]. Mother has a history of bad choices and doesn't acknowledge the impact on children, especially [CJM].

[4] Father has provided a safe, secure, and loving home. While he has significant criminal history, it appears that he has overcome those obstacles and is able to provide stability to [CJM].

CP at 77-78.

The trial court concluded that it was granting a major modification to the parenting plan because CJM's "current living situation is harmful to [his] physical, mental, or emotional health. It would be better for [him] to change the parenting/custody order." CP at 78.

The final order provided,

- The requested change is in the children's best interest, and
- There has been a substantial change in the children's situation or in the situation of the parent (or non-parent custodian) who did not request the major change.

CP at 77.

On October 6, 2016, the trial court entered a modified parenting plan. The parenting plan provided Harris with primary residential placement. The trial court also ordered McLeroy to attend a protective parenting group. It did this based on the finding that "Shakira McLeroy uses conflict in a way that endangers or damages the psychological development of [CJM]." CP at 83.

ANALYSIS

McLeroy argues that the trial court abused its discretion when it entered a modification order changing residential placement of CJM to Harris and modifying certain terms of the

9

parenting plan. Because the trial court did not err, or any error is harmless, we hold that the trial court did not abuse its discretion.

We review a trial court's decision to modify a parenting plan for abuse of discretion. *In re Marriage of Zigler*, 154 Wn. App. 803, 808, 226 P.3d 202 (2010). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *Zigler*, 154 Wn. App. at 808-09 (quoting *In re Marriage of Fiorito*, 112 Wn. App. 657, 664, 50 P.3d 298 (2002)). A court's decision is manifestly unreasonable if it is outside the range of acceptable choices given the facts and the applicable legal standard, it is based on untenable grounds if the factual findings are unsupported by the record, and it is based on untenable reasons if it is based on an incorrect standard or the facts do not support the legal conclusions. *Fiorito*, 112 Wn. App. at 664. Parenting plan modifications are rarely reversed on appeal because the emotional and financial interests affected by such decisions are best served by finality. *In re Parentage of Jannot*, 149 Wn.2d 123, 127-28, 65 P.3d 664 (2003).

## I. CPS RECORDS

McLeroy argues that the trial court erred when it admitted and considered hearsay statements in CPS records and the records were improperly used to support the conclusion that McLeroy's present living situation was detrimental to CJM.[3] We hold that any error is harmless.

---

[3] Harris failed to timely file a responding brief and, as a result, we do not have the benefit of a responsive brief.

A. PRINCIPLES OF LAW

We review the trial court's decision to admit evidence for abuse of discretion. *Zigler*, 154 Wn. App. at 814. A court abuses its discretion when its ruling is based upon untenable grounds or reasons. *Zigler*, 154 Wn. App. at 808-09.

Hearsay is generally not admissible unless an exception applies. ER 802. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c).

We do not reverse a ruling based on an evidentiary error unless the error was prejudicial. *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983). An error is not prejudicial unless it affects, or presumptively affects, the outcome of the trial. *Brown*, 100 Wn.2d at 196. And we do not generally consider the erroneous admission of hearsay prejudicial where it is merely cumulative of properly admitted evidence. *Brown*, 100 Wn.2d at 196.

B. HEARSAY CONSIDERED IN ORAL RULING

McLeroy asserts that the trial court erred when it discussed statements from the CPS reports in its oral ruling. This argument fails.

A trial court's oral ruling is only a verbal expression of its informal opinion at the time and may be altered, modified, or completely abandoned by the time the written ruling is entered. *In re Dependency of C.M.*, 118 Wn. App. 643, 650, 78 P.3d 191 (2003). As such, an oral ruling "'has no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment.'" *Stiles v. Kearney*, 168 Wn. App. 250, 258, 277 P.3d 9 (2012) (quoting *Ferree v. Doric Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963)). Our use of a trial court's oral ruling is limited to

11

interpreting an *ambiguous* written ruling; when a trial court's written ruling is unambiguous, we do not consider the trial court's oral ruling. *C.M.*, 118 Wn. App. at 650.

McLeroy argues that some of the trial court's statements relied on "hearsay within hearsay" because they are statements from either police reports or CPS referrals contained within CPS records. Br. of Appellant at 9. But even assuming without deciding that the challenged CPS records and statements contained therein are hearsay, McLeroy has not explained why we should consider the oral ruling nor how the written ruling is ambiguous. Because we refer to the oral ruling only when the trial court's written ruling is ambiguous and there is no argument here that the written findings and conclusions are ambiguous, we do not consider the court's oral ruling. *C.M.*, 118 Wn. App. at 650.

Thus, McLeroy's claim that the trial court improperly considered hearsay in its oral ruling fails. *See C.M.*, 118 Wn. App. at 650.

## C. WRITTEN FINDINGS

Related to her hearsay argument, McLeroy challenges portions of written findings that allegedly rely on improper hearsay evidence. She argues that these erroneous findings were relied upon to support the trial court's conclusion that CJM's present environment was harmful to his health. Assuming, without deciding, that the CPS records and statements contained therein were improperly admitted hearsay, any error is harmless because the allegedly improper evidence is either merely cumulative to unchallenged evidence or unnecessary to support the trial court's modification decision.

1.      "CPS HAS BEEN INVOLVED MULTIPLE TIMES."

McLeroy challenges the part of finding 1 that states, "'CPS has been involved multiple times.'" Br. of Appellant at 10. Where improperly admitted hearsay evidence is merely cumulative of *properly* admitted evidence, the hearsay is not prejudicial. *Brown*, 100 Wn.2d at 196.

Here, the CPS records were only one source of evidence that CPS had investigated McLeroy. Harris testified that he received multiple CPS calls that ultimately motivated him to obtain a protection order against McLeroy on CJM's behalf. And Harris stated that CPS called him regarding CJM on three occasions to ensure he was safe when "the other party has gone through any type of situation, or CPS has been called or there's been any type of police action." 2 RP at 83. Furthermore, McLeroy's counsel asked Harris how many times CPS received referrals about CJM, and Harris said, "Quite a few." 2 RP at 68. This properly admitted testimony is cumulative to the hearsay in the CPS reports indicating that CPS had been involved multiple times. As such, the trial court's finding that CPS had been involved multiple times is amply supported without considering the CPS records. *See Brown*, 100 Wn.2d at 196.

2.      "MOTHER REFUSED VOLUNTARY SERVICES IN JANUARY 2015."

McLeroy challenges the portion of the trial court's finding stating that "'mother refused voluntary services in January 2015.'" Br. of Appellant at 10. She argues that the trial court erred when it entered this finding because it is supported by only the hearsay in CPS records.

McLeroy is correct that the only evidence supporting the "voluntary services" finding is a CPS record. But even if we assume, without deciding, that the CPS record is hearsay and the trial

13

court erred in considering it, the error is harmless if it did not affect the outcome of the trial. *See Brown*, 100 Wn.2d at 196.

McLeroy appears to argue that the hearsay evidence was prejudicial because the trial court relied on it to support its conclusion that the mother's present living situation is detrimental to CJM. However, the finding regarding McLeroy's refusal of services was not necessary to support the trial court's conclusions. As discussed in detail below, numerous other findings that did not rely on the CPS records independently supported the trial court's conclusion regarding detriment. The trial court found that CJM was insecure when he first started living with Harris and Haslem and had nightmares and fears, McLeroy lacks insight into the impact that domestic violence in her home had on CJM, and McLeroy was subject to a DVPO and has a history of bad choices but does not acknowledge the impact of the choices on her children. These findings, which do not rely on hearsay evidence, independently support the conclusion that living with McLeroy was detrimental to CJM's mental and emotional health. Thus, the CPS records were not necessary to support the trial's outcome, and any error admitting hearsay was harmless. *See Brown*, 100 Wn.2d at 196.

## II. CONSIDERATION OF PAST CIRCUMSTANCES

McLeroy argues that the trial court improperly considered *past* incidents when it modified the parenting plan rather than basing its decision on the "actual household circumstances at the time of trial." Br. of Appellant at 11. Specifically, she argues that the trial court, in modifying the parenting plan, improperly relied on findings that McLeroy had a history of domestic violence and that she had threatened Harris's girlfriend at a 2015 court hearing. We reject this argument because trial courts may consider both past and present circumstances in a modification trial.

We review a trial court's decision to modify a parenting plan for abuse of discretion. *Zigler*, 154 Wn. App. at 808.

McLeroy relies on *In re Marriage of Littlefield*, 133 Wn.2d 39, 940 P.2d 136 (1997), and *In re Marriage of Ambrose*, 67 Wn. App. 103, 834 P.2d 101 (1992), to support that the trial court abused its discretion when it failed to base its modification decision on circumstances at the time of trial.

## A. *Littlefield*

In *Littlefield*, our Supreme Court considered whether, when entering an *initial* parenting plan, a trial court has authority to require parents to relocate to a specific geographic area to facilitate better contact between the child and both parents. 133 Wn.2d at 46. In this context, the court said that a residential schedule must be based on physical circumstances as they exist at trial and not based on a court-ordered geographic arrangement requiring parties to change their physical location to facilitate a more desirable parenting plan. *Littlefield*, 133 Wn.2d at 56.

McLeroy has failed to explain why this case addressing a trial court's authority to order relocation prior to an initial parenting plan has any bearing in the context of this parenting plan modification. As such, *Littlefield* fails to support her argument.

## B. *AMBROSE*

Contrary to McLeroy's assertions, *Ambrose* supports that a trial court must consider any relevant circumstances, both past and present, before ordering a parenting plan modification. In *Ambrose*, the father obtained a temporary change of primary residential placement because the mother was incarcerated, and several months later, the father sought an order to make the change permanent. 67 Wn. App. at 104-05. Nine months later, the trial court held a trial and *refused* to

15

consider the mother's circumstances at trial and considered *only* the facts that were present at the time the father filed his modification petition. *Ambrose*, 67 Wn. App. at 105. The mother appealed, arguing that the parenting plan modification statute, RCW 26.09.260, requires the trial court to consider whether the child's present environment is detrimental to the child's health before ordering a modification to the residential schedule. We reversed, holding that

> [w]hile *evidence regarding [the mother's] situation at or about the time the children were removed from her residence was certainly relevant* on the question of the children's present environment, evidence regarding her *circumstances at or about the time of trial was also probative* on that issue. It is for the trier of fact to determine the relative weight of such evidence.
> . . . .
> *We do not mean to suggest by our holding here that the trial court may not consider the children's environment while they were in [the mother's] custody prior to the entry of the temporary order.* We are simply saying that the trial court must consider any and all relevant evidence to determine if [the mother] is presently a fit parent capable of providing a suitable home for the children.

*Ambrose*, 67 Wn. App. at 108-09 (emphasis added).

The court in *Ambrose* specifically provided that past circumstances are relevant to modifications. 67 Wn. App. at 109. Contrary to McLeroy's assertion, present and past facts are both relevant to the question of whether an environment is detrimental to a child's health. As such, *Ambrose* supports the trial court's consideration of facts that occurred before trial. Thus, McLeroy's argument fails.

## III. SUBSTANTIAL EVIDENCE

McLeroy raises several arguments that evidence does not support the trial court's factual findings, which in turn do not support its conclusions that CJM's current living situation is harmful

to his health and the parenting plan modification is in CJM's best interest.[4] She argues that because the findings and conclusion are unsupported, the modification was improper. We hold that substantial evidence supports the trial court's relevant findings and these findings support its conclusions.

A. PRINCIPLES OF LAW

We review challenges to the trial court's factual findings for substantial evidence. *In re Marriage of Fahey*, 164 Wn. App. 42, 55, 262 P.3d 128 (2011). Substantial evidence exists if the record contains sufficient evidence to persuade a fair-minded, rational person of the finding's truth. *Fahey*, 164 Wn. App. at 55. The party challenging a finding bears the burden of showing that it is not supported by the record. *Standing Rock Homeowners Ass'n v. Misich*, 106 Wn. App. 231, 243, 23 P.3d 520 (2001). Unchallenged findings are verities on appeal, and challenged findings are also binding on appeal if they are supported by substantial evidence. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002); *Standing Rock*, 106 Wn. App. at 243.

"We defer to the trial court's determinations on the persuasiveness of the evidence, witness credibility, and conflicting testimony." *Snyder v. Haynes*, 152 Wn. App. 774, 779, 217 P.3d 787 (2009).

We review conclusions of law to determine whether factual findings that are supported by substantial evidence in turn support the conclusions. *Fahey*, 164 Wn. App. at 55-56.

RCW 26.09.260 provides the standards governing parenting plan modifications:

(1) . . . [T]he court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial

---

[4] McLeroy fails to assign error to specific findings of fact, as RAP 10.3(a)(4) requires.

change has occurred in the circumstances of the child or the nonmoving party and that the *modification is in the best interest of the child and is necessary to serve the best interests of the child. . . .*

(2) In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:

. . . .

(c) The *child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child*.

(Emphasis added.)

## B. FINDINGS OF FACT

McLeroy challenges the trial court's findings that (1) she had a history of domestic violence, (2) an incident occurred when McLeroy threatened Harris's girlfriend, (3) McLeroy lacks insight into the effects of domestic violence on the children, and (4) McLeroy was an aggressor in DVPO cases. Substantial evidence in the record supports the first three of these factual findings. And although substantial evidence does not support the fourth finding, this error is harmless because this finding was not necessary to support the challenged conclusion.

### 1. DOMESTIC VIOLENCE HISTORY

McLeroy challenges the part of finding of fact 1 that states she "'has a history of domestic violence. CPS has been involved multiple times.'" Br. of Appellant at 13.

McLeroy testified that she had been a victim of domestic violence for three years and that Lockett was "very abusive" and "controlling." RP (Sept. 27, 2016) at 22. McLeroy's counsel admitted at trial that McLeroy had been married to a woman who was abusive to McLeroy and "those around her." RP (Sept. 27, 2016) at 13. Louis also testified that his home was a "safe house for the kids" if McLeroy ever needed assistance. 2 RP at 130. And McLeroy's threat against Haslem at the DVPO hearing supports that McLeroy engaged in domestic violence herself. Thus,

18

there is ample evidence that McLeroy had a history of domestic violence in that the children were exposed to domestic violence in her home. As such, there is enough evidence to persuade a fair-minded, rational person that McLeroy had a history of domestic violence. *See Fahey*, 164 Wn. App. at 55.

In addition, evidence supports that "CPS has been involved multiple times." CP at 77. Harris testified that he received multiple CPS calls that ultimately motivated him to obtain a protection order against McLeroy on CJM's behalf. And Harris stated that CPS called him regarding CJM on three occasions. McLeroy's counsel asked Harris how many times CPS received referrals about CJM, and Harris said, "Quite a few." 2 RP at 68. These facts are sufficient to persuade a fair-minded, rational person that CPS was involved multiple times, investigating CJM's safety. *See Fahey*, 164 Wn. App. at 55.

In challenging the trial court's finding regarding her history of domestic violence, McLeroy argues that she cut off contact with Lockett a year before trial, and the trial court must consider only *present* circumstances at the time of trial rather than past circumstances regarding prior abuse in the home. But past circumstances may be properly considered in a modification trial. *See Ambrose*, 67 Wn. App. at 109. Thus, the fact that McLeroy exposed CJM to Lockett for three years was relevant to whether McLeroy's environment was detrimental to CJM. *See Ambrose*, 67 Wn. App. at 109.

Apparently in connection with her challenge to the finding regarding McLeroy's domestic violence history, McLeroy also argues that evidence does not support the trial court's oral finding that McLeroy was not credible when she said she had not seen Lockett in over a year. As discussed

19

earlier, we need not consider the court's oral ruling unless the written ruling is ambiguous. *C.M.*, 118 Wn. App. at 650.

2.  MCLEROY'S BEHAVIOR AT PRIOR COURT HEARING

Next, McLeroy challenges part of the trial court's second finding of fact that stated, "This court found Mr. Harris and Ms. Haslem credible regarding mother's expressed anger at the 5/7/15 Court hearing."[5] CP at 78.

McLeroy's only argument regarding this finding is that an incident that occurred at a hearing over a year prior is irrelevant to the modification, which requires a consideration of only circumstances as they existed at trial. As discussed above, past events and circumstances may be considered in a modification trial. *Ambrose*, 67 Wn. App. at 109.

Further, substantial evidence also supports the finding regarding McLeroy's behavior at the 2015 court hearing. Harris's girlfriend of more than four years, Haslem, testified that at the hearing to obtain a DVPO against McLeroy, McLeroy threatened to beat up Haslem. The trial court found this testimony credible, and we defer to this credibility finding. *Snyder*, 152 Wn. App. at 779. As such, there is enough evidence to persuade a fair-minded, rational person that McLeroy expressed anger by making threats at the 2015 court hearing. *See Fahey*, 164 Wn. App. at 55. Substantial evidence thus supports the trial court's finding. *Fahey*, 164 Wn. App. at 55.

---

[5] To the extent McLeroy challenges a similar oral finding, her argument fails because we reach oral findings only when the written finding is ambiguous. *C.M.*, 118 Wn. App. at 650. Because McLeroy has not argued that the written finding is ambiguous, we do not consider the oral finding.

3.    LACK OF INSIGHT

McLeroy challenges the trial court's finding that she lacked insight into the effect of domestic violence in the presence of children. She argues that, as stated in "uncontroverted testimony," she attended counseling and learned she cannot let someone "'run over'" her and control her. Br. of Appellant at 15.

But McLeroy's testimony also indicates that she did not recognize the impact of domestic violence on her children. Harris asked McLeroy whether she had stopped making poor choices such as the choice to be in a relationship with Lockett. McLeroy responded that "*I feel as though it wasn't about me making poor choices. It was about me settling for the wrong people in my life*, and she's no longer in my life." RP (Sept. 27, 2016) at 39 (emphasis added). McLeroy stated that she was the "victim in the domestic violence for three years," but did not acknowledge her poor decision making or the impact this had on CJM. RP (Sept. 27, 2016) at 40. At no point in her testimony did she express that CJM's exposure to domestic violence for three years was harmful to CJM.

McLeroy's testimony indicates that she perceived herself as a victim, but she did not indicate that she perceived her *children* were also victims or that her choices resulted in the wrong people being present in CJM's life. In addition, McLeroy's decision to lift a no-contact order against Lockett and her subsequent decision to not obtain a protection order when Lockett was stalking her, indicates that McLeroy lacked insight into the risks posed by Lockett's domestic violence. There is enough evidence to persuade a fair-minded, rational person that McLeroy lacked insight into how domestic violence impacted CJM, so substantial evidence supports the trial court's finding. *Fahey*, 164 Wn. App. at 55.

21

## C. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT ONE FINDING

McLeroy also challenges the trial court's finding that "while she is the alleged victim of some of the interactions with [Lockett], she is also the aggressor in other dvpo's [sic]." CP at 78. McLeroy argues that there is no evidence that she was the aggressor in DVPOs or that she herself was ever the perpetrator of domestic violence.

McLeroy is correct that substantial evidence does not support the finding that she was the aggressor in DVPOs. The only evidence in the record regarding whether McLeroy was the aggressor in DVPOs is that in April 2015, Harris suspected CJM was being abused and on behalf of CJM, Harris obtained a DVPO against McLeroy. In addition, testimony supports that CJM expressed fear that he would have to go back to live with McLeroy and asked for reassurance that he would be able to stay with Harris.

However, this evidence does not necessarily mean that McLeroy herself had perpetrated domestic violence. It equally supports that McLeroy's home was unsafe because of the domestic violence relationship between McLeroy and Lockett. But as discussed below, this finding was not necessary to support the conclusion that the environment was detrimental to CJM, so the erroneous finding is harmless. *See Brown*, 100 Wn.2d at 196

## D. FINDINGS SUPPORT THE CHALLENGED CONCLUSION

McLeroy challenges two of the trial court's conclusions supporting its parenting plan modification that granted Harris primary residential placement.

We examine whether the factual findings that are supported by substantial evidence, discussed above, in turn support the challenged conclusions. *Fahey*, 164 Wn. App. at 55-56.

McLeroy challenges the conclusion that CJM's "current living situation is harmful to [his] physical, mental, or emotional health. It would be better for [him] to change the parenting/custody order." CP at 78. She also appears to challenge the conclusion that "[t]he requested change is in the children's best interest." CP at 77.

McLeroy's relationship with Lockett exposed CJM to domestic violence for three years, and McLeroy failed to demonstrate any insight into the effect this had on her son. The domestic violence had a negative emotional and mental impact on CJM, as evidenced by his "responses . . . upon leaving and returning from supervised visits as well as his insecurity when he first came to [Harris's] home, including nightmares and demonstrating fears." CP at 78.

That Harris, on behalf of CJM, obtained a DVPO against McLeroy demonstrates, at the very least, that she failed to provide CJM with a safe environment. CPS involvement, discussed in McLeroy's testimony, is somewhat probative of instability in McLeroy's home. McLeroy also demonstrated a capacity for violent outbursts that could be harmful to CJM when she threatened to beat up Harris's girlfriend at a court hearing. In addition, it is undisputed that "[f]ather has provided a safe, secure, and loving home." CP at 78.

These findings of fact support the trial court's conclusion that McLeroy's residential care of CJM was detrimental and that it was in CJM's best interest to modify the parenting plan. *See Fahey*, 164 Wn. App. at 55-56.

## IV. FATHER'S DOMESTIC VIOLENCE HISTORY

McLeroy argues that the trial court erred when it failed to make a finding that Harris has a history of acts of domestic violence under former RCW 26.09.191(2)(a) (2011). She argues that "failure to make a finding about Mr. Harris'[s] domestic violence conviction alone is a basis for

23

reversing the trial court." Br. of Appellant at 17. We reject this argument because McLeroy has not provided authority that the trial court was *required* to make a finding that Harris had a history of domestic violence.

### A. PRINCIPLES OF LAW

"The parent's residential time with the child shall be limited if it is found that the parent has engaged in . . . a history of acts of domestic violence as defined in RCW 26.50.010(1) or an assault or sexual assault that causes grievous bodily harm or the fear of such harm." Former RCW 26.09.191(2)(a).

Domestic violence means "(a) [p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members; (b) sexual assault of one family or household member by another; or (c) stalking as defined in RCW 9A.46.110 of one family or household member by another family or household member." RCW 26.50.010(3).

The trial court has discretion to determine whether the evidence presented meets the requirements of former RCW 26.09.191 (2011). *In re Parenting & Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016).

### B. FAILURE TO FIND DOMESTIC VIOLENCE HISTORY

McLeroy argues that because Harris was convicted of assaulting a former girlfriend, the trial court abused its discretion by failing to enter findings regarding his history of domestic violence.

McLeroy presented evidence at trial that Harris had a 2013 domestic violence conviction for assaulting a former girlfriend. After the oral ruling, the trial court stated it would not enter a finding "regarding Mr. Harris's domestic violence conviction." RP (Oct. 6, 2016) at 10.

But McLeroy has not explained how this incident satisfies the definition of "domestic violence" under RCW 26.50.010(3) or how the single incident qualifies as a "history of acts of domestic violence" under former RCW 26.09.191(2)(a). In addition, she has not provided authority that a trial court is *required* to find a parent has a "history of acts of domestic violence" under former RCW 26.09.191(2)(a) when evidence supports that the parent has committed a domestic violence assault.

McLeroy cites *In re Marriage of C.M.C.*, 87 Wn. App. 84, 940 P.2d 669 (1997), *aff'd*, 136 Wn.2d 800, 966 P.2d 1247 (1998), and *L.H.* to support that failure to make findings about domestic violence is abuse of discretion. But neither of these cases controls.

In *C.M.C.*, the trial court found that the father had a history of acts of domestic violence as defined under former RCW 26.09.191(1), but it failed to enter the restrictions required under former RCW 26.09.191 upon such a finding. 87 Wn. App. at 86-87. Contrary to McLeroy's claims, this case does not provide that a trial court abuses its discretion when it fails to enter a finding regarding a party's domestic violence history; rather, it states that when a trial court finds a party has a history of domestic violence under former RCW 26.09.191, it must impose certain restrictions on that parent. *C.M.C.*, 87 Wn. App. at 89.

In *L.H.*, the trial court declined to enter findings that the father had a history of acts of domestic violence because such findings would "'haunt him'" and the court would "'hate to have this record follow [the father] around like some ghost.'" 198 Wn. App. at 195. We held that the

trial court abused its discretion because the trial court's reasoning for declining to enter findings was untenable. *L.H.*, 198 Wn. App. at 195. McLeroy has failed to explain how the trial court's decision to not enter a finding here was based on untenable grounds. As such, *L.H.* does not control here.

McLeroy has failed to show that the trial court abused its discretion when it declined to find that he had a history of acts of domestic violence within the meaning of former RCW 26.09.191(2)(a).

## V.  ABUSIVE USE OF CONFLICT

McLeroy appears to argue that substantial evidence does not support the trial court's finding that McLeroy engaged in an abusive use of conflict, and therefore the "restrictions" on McLeroy should be reversed.

McLeroy fails to identify the "restrictions" that the trial court imposed based on its finding that she engaged in an abusive use of conflict. And her argument is misleading, because it suggests that numerous restrictions were imposed based on the abusive use of conflict finding. Contrary to her assertion, it appears from the record that the *only* limitation imposed on McLeroy as a result of her abusive use of conflict is that the trial court ordered McLeroy to attend a "Protective Parenting Group (to deal with impact of [domestic violence] on kids)." CP at 84. Yet McLeroy fails to even mention this restriction.

A trial court may preclude or limit *any* provisions of the parenting plan if there is an abusive use of conflict by the parent that creates the danger of serious damage to the child's psychological development. Former RCW 26.09.191(3)(e); *In re Marriage of Watson*, 132 Wn. App. 222, 232, 130 P.3d 915 (2006). A trial court may require a parent to attend parenting classes if they are

found to engage in conduct enumerated under former RCW 26.09.191(3), which includes abusive use of conflict. *See In re Marriage of Chandola*, 180 Wn.2d 632, 646-48, 327 P.3d 644 (2014).

Substantial evidence in the record supports the trial court's finding that McLeroy engaged in abusive use of conflict. Louis testified that he acted as a "go-between" to communicate information between McLeroy and Harris because they do not speak to each other. 2 RP at 138. The Robertsons, rather than McLeroy, provided transportation when CJM visited with McLeroy. In addition, Harris testified that when Harris tried to contact McLeroy to discuss CJM, she told Harris that she did not want to talk to him. Harris said, "[I]t makes parenting hard when you don't have two parents that can talk about anything. I'm willing. I try. But it's not from the other side. It's not." RP (Sept. 27, 2016) at 53.

And McLeroy threatened to beat up Harris's girlfriend at the 2015 DVPO hearing. In addition, Harris obtained a DVPO against McLeroy, which granted Harris primary residential placement pending the modification trial. McLeroy also had a history of domestic violence and exposed CJM to domestic violence for three years. And McLeroy refused to communicate with Harris regarding CJM. McLeroy fails to explain how these facts are insufficient to support the trial court's finding.

This evidence is sufficient to persuade a fair-minded, reasonable person that McLeroy engaged in abusive use of conflict. *See Fahey*, 164 Wn. App. at 55. As such, the trial court did not abuse its discretion when it required her to attend a protective parenting group.[6]

---

[6] McLeroy challenges only the trial court's finding that she engaged in an "abusive use of conflict" and does not mention the second part of the trial court's finding that her use of conflict creates a danger of serious damage to CJM's development. Br. of Appellant at 18.

## VI. CHILD SUPPORT

McLeroy argues that if we reverse the parenting plan modification, we should also reverse the modification requiring McLeroy to pay child support. Because we affirm the parenting plan modification, the child support order is also affirmed.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

BJORGEN, C.J.

SUTTON, J.